**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **RAMONA GROVES,** | Case No.: 13-CV-2259 YGR |
| Plaintiff, | **ORDER GRANTING MOTION TO DISMISS AND DISMISSING FIRST AMENDED COMPLAINT WITHOUT PREJUDICE** |
| v. | |
| **KAISER FOUNDATION HEALTH PLAN INC.,** *et al.*, | |
| Defendants. | |

**I.    INTRODUCTION**

Before the Court is a motion to dismiss the First Amended Complaint of Plaintiff Ramona Groves.  As alleged therein: In November 2009, Plaintiff accepted an offer of early retirement from her employer, Defendant Kaiser Foundation Health Plan, Inc. ("Kaiser").  Plaintiff was then 55 years old and making $140,000 per year, plus benefits.  Plaintiff opted for a lump-sum payout of her pension benefit.  Before her official retirement date, Plaintiff repeatedly inquired into the amount of her payout.  The Kaiser Permanente Salaried Retirement Plan ("Plan") repeatedly responded, orally and in writing, through statements delivered by Defendant Hewitt,[1] that Plaintiff

---

[1] Plaintiff names this defendant as "AON (formerly known as Hewitt)," alleging that AON is Hewitt's successor in interest. (Dkt. No. 11 (First Amended Complaint ("FAC")) ¶ 15.) Defendants assert that Hewitt Associates LLC is the real party in interest. Either way, the entity is allegedly a "non-fiduciary service provider to the [Plan]." (*Id.* ¶ 6.) For simplicity, the Court refers to this entity as "Hewitt."

was eligible for a lump sum payout of roughly $750,000, with the final amount calculated to be $766,889.54.  The Plan paid that amount to Plaintiff in January 2010.  Not surprisingly, Plaintiff comingled the funds with her personal accounts and paid taxes on the monies received.

Twenty-two months later, in November 2011, a representative of the Kaiser Permanente Retirement Center notified Plaintiff that she had been overpaid by more than $240,000 and that she was obligated to repay the overage, with interest.  The overpayment resulted solely from Hewitt's apparent data entry error.

Plaintiff has exhausted her administrative remedies and instituted this civil action.  The FAC asserts three separate claims: as against Kaiser, (1) equitable estoppel, as provided under the Employee Retirement Income Security Act ("ERISA") at 29 U.S.C. § 1132(a)(3), and, as against Hewitt, (2) negligence and (3) negligent misrepresentation.  Defendants have filed a motion to dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that federal law precludes Plaintiff's negligence claims and equitable principles provide no basis for relief.[2]

Having carefully considered the parties' papers and argument in light of the applicable law of the Ninth Circuit, and for the reasons set forth below, the Court **GRANTS** Defendants' motion and **DISMISSES** Plaintiff's FAC.  The dismissal is without prejudice to further amendment.

## II.     BACKGROUND

Given the procedural posture of this case, the Court accepts as true the well-pleaded factual allegations of Plaintiff's FAC and construes them in the light most favorable to Plaintiff.  The parties do not dispute that ERISA governs the subject Plan.

### A.     KAISER OFFERS AN EARLY RETIREMENT PACKAGE IN 2009

Plaintiff Ramona Groves began her permanent employment with Kaiser in May 1976.  (FAC ¶ 7.)  Kaiser provided its employees with the opportunity to participate in the Kaiser Permanente Salaried Retirement Plan, a defined benefit plan.  (FAC ¶ 8.)  Plaintiff participated in the Plan.  (*Id.*)

---

[2] The Motion is fully briefed.  (Dkt. Nos. 17 ("Motion"), 25 ("Opp'n"), 26 ("Reply").)  Further, the Court received supplemental briefing on certain matters (Dkt. Nos. 34 ("Pl. Supp. Brief"), 35 ("Defs. Supp. Brief"), and heard oral argument on November 12, 2013.

2

In or about March of 2009, Kaiser sent a letter to its employees regarding changes to the calculation used to determine the single sum amount pension benefit payments in accordance with the Pension Protection Act of 2006 ("PPA"). (FAC ¶ 10.) The letter stated that the resulting changes could potentially affect retirees' decisions regarding when to retire and which method of payment to choose. (*Id.*) Kaiser, in sending the above-mentioned letter, urged its recipients to read the enclosed materials carefully in order to make "informed decisions" about retirement. (FAC ¶ 11.) The materials specifically advised recipients that it might be in the "best interest" of participants who planned on retiring in 2010 to retire instead in 2009, "before the changes become effective." (*Id.*) The materials also admonished:

> Before you make a retirement or a pension distribution decision, review all your payment options carefully. Contact the Kaiser Permanente Retirement Center to talk to a Retirement Specialist who can advise you about your particular options. You may also want to talk to a professional financial planner. If you DO want to retire before the PPA changes take effect, keep in mind that you must retire (and initiate your retirement paperwork) no later than October 1, 2009 . . . with the distribution date of December 1, 2009.

(FAC ¶ 12.) The booklet stated that an estimate of a pension benefit could be received over the phone by contacting the Kaiser Permanente Retirement Center. (*Id.*).

**B.   PLAINTIFF DECIDES TO TAKE EARLY RETIREMENT IN 2009**

Plaintiff, who was 55 years old at the time, was eligible for early retirement in 2009. (FAC ¶ 13.) In reliance on materials provided by Kaiser, and particularly on the statement that "it may be in her best interest" to retire early, Plaintiff contacted Kaiser Permanente Retirement Center by phone on or about July 7, 2009 to discuss the possibility of early retirement. (FAC ¶¶ 13-14.) Plaintiff spoke with "Christopher," who represented himself as a Retirement Specialist. (FAC ¶ 14.) Christopher stated that the date of "early" retirement, prior to the implementation of retirement changes pursuant to the PPA would be November 30, 2009. (*Id.*) Christopher quoted Plaintiff an early retirement lump sum payout of $729,677.05. (*Id.*) In response to Plaintiff's inquiry about the amount she would receive if she chose to retire *after* January 1, 2010, Plaintiff was given a quote of $619,697.11. (*Id.*) Concerned about such a large difference in the quotes, Plaintiff sought assurances from Christopher about the correctness of figures given. (*Id.*) Christopher repeatedly stated that the quotes provided were correct. (*Id.*)

Plaintiff requested that Kaiser Permanente Retirement Center provide her with a written statement of pension benefit estimates for both options—early retirement effective November 30, 2009, and retirement effective January 1, 2010.  (FAC ¶ 15.)  Kaiser, through statements "delivered by Hewitt," provided Plaintiff with the requested information.  The figures in the written statements matched the verbal information provided by Kaiser Permanente Retirement Center during the telephone conversation on July 7, 2009.  (*Id.*)

After obtaining the written quotes from Kaiser, Plaintiff, as suggested by Kaiser's materials received in March 2009, sought the services of a professional financial adviser.  (FAC ¶ 17.)  Plaintiff provided the adviser with all relevant documents sent by Kaiser and/or Hewitt reflecting the final figures of pension benefit payouts for the years of 2009 ($729,677.05) and 2010 ($619,697.11) and all relevant information concerning Plaintiff's personal financial situation.  (FAC ¶ 18.)  Plaintiff explained that she needed to know whether it would be feasible to retire based on the payout amounts considering: (1) her family's living expenses and monthly financial obligations; (2) her husband's health and inability to work full-time[3]; (3) the need to maintain Plaintiff's residence properly; and (4) Plaintiff's then-existing financial situation.  (*Id.*)  The financial planner advised Plaintiff that, taking all the factors into consideration, it would be feasible for her to accept early retirement based on the payout sum estimate of $729,677.05.  (FAC ¶ 19.)

After significant consideration and in reliance on the information provided by Defendants, Plaintiff decided to retire early from her 35-year career with Kaiser.  (FAC ¶ 21.)  In August 2009, Plaintiff notified her manager of her intent to retire effective November 30, 2009.  (*Id.*)  Had Plaintiff been properly informed by the Plan of the correct calculations, she would have immediately withdrawn her resignation and remained as a full-time employee of Kaiser.  (*Id.*).

### C. RETIREMENT ARRANGEMENTS AND BENEFITS CONFIRMED

After she gave notice of intent to retire early, Plaintiff began the process of completing the required paperwork.  (FAC ¶ 22.)  During the process, which lasted several months, she made multiple calls to Kaiser Permanente Retirement Center to discuss various topics, including the

---

[3] Plaintiff alleges that her husband "was unable to work due to diabetes complications," leaving Plaintiff as "the sole wage earner in her household since 2003."  (FAC ¶ 16.)

4

1   payout amount.  (*Id.*)  During each of these telephone calls, the payout amount was confirmed,

2   notwithstanding minor modifications.  (*Id.*)  Defendants provided Plaintiff with documents

3   indicating that the amount calculated was "final."  (*Id.*)

4        The amount of payout was recalculated by Kaiser and/or Hewitt numerous times.  (FAC ¶

5   23.)  The total pension benefit payout sum increased to $748,740.93, reflecting Plaintiff's unused

6   paid time off and accrued extended sick leave.  (*Id.*)  In October 2009, Plaintiff was notified that

7   her payout amount increased to $748,961.97.  (*Id.*)

8        In January 2010, prior to receiving the payout, Plaintiff received the final correspondence

9   concerning her payout, dated January 11, 2010.  The letter stated:

10  
11  
12  
13  
> When you completed your payment elections for your Plan benefit, *the benefit amounts were based on the information we had on file about you at the time of your initial benefit calculation*.  We've recalculated your benefit based on your *final payroll information* and interest rates.  Based on the results of the new calculation, your *final lump sum payment* will be equal to $766,889.54.

14  (FAC ¶ 24 (emphases in FAC).)

15       The Plan provides that it is a duty of the Administrative Committee (the Plan) to assure

16  prompt and *correct payment* of all Plan benefits.  (FAC ¶ 25 (emphasis in FAC).)  Plaintiff

17  assumed that the amounts cited to her by Kaiser and/or Hewitt were correct.  (*Id.*)  The Plan also

18  provides that a "Single Sum" method of payment means "An amount equal to the *present value* of

19  the Participant's Pension as of the Benefit Starting Date is provided to him in a single payment."

20  (FAC ¶ 26 (emphasis in FAC).)[4]

21  ///

22  

---

23  [4] The FAC alleges that the Plan provides no definition of the term "present value."  (FAC ¶ 26.)
24  The Court, however, disregards this allegation.  Though a court generally is obligated to regard the well-pleaded facts of a complaint as true when deciding a Rule 12(b)(6) motion, that principle gives
25  way when the allegations contradict documents attached to the complaint or incorporated by reference.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Lazy Y Ranch Ltd. v. Behrens*,
26  546 F.3d 580, 588 (9th Cir. 2008).  Here, the FAC relies upon the plan documents but does not include them as exhibits.  Defense counsel, however, has attached them to his declaration (Dkt. No.
27  27, Exs. A & B), and no party disputes their authenticity.  Accordingly, the Court incorporates the
28  plan documents by reference.  As set forth within, the documents, contrary to paragraph 26 of the FAC, provide a method for calculating the present value of a pension.

### D. RECEIPT OF PAYOUT AND DEMAND FOR REIMBURSEMENT

On January 15, 2010, the Plan issued a final check in the amount of $766,889.54. Plaintiff has since commingled these funds with others and has incurred and paid substantial taxes as a result of the amount of the lump sum payout as described above and having accessed portions of these funds. (FAC ¶ 27.)

Roughly 22 months later, on or about November 16, 2011, Plaintiff received a call from a person identifying himself as "Christopher" of the Kaiser Permanente Retirement Center, stating that, as a result of an audit, it was determined that Plaintiff's early retirement payout was overpaid in excess of $257,000.00. (FAC ¶ 29.) Plaintiff was not given any further explanation as to the reason for the miscalculation. (*Id.*) The Kaiser Permanente Retirement Center representative informed Plaintiff that a letter with further explanation was forthcoming. (*Id.*)

Subsequently, Plaintiff received the "Overpayment Notice" from Kaiser and/or Hewitt dated November 15, 2011. (FAC ¶ 31.) The Notice stated:

> As a result of a recent audit, it's been determined the pension benefit you received was based on incorrect information. Specifically, your benefit payment was based on incorrect pay rates beginning March 1, 2006 to February 28, 2007 . . . . Our records show you received a pension benefit in the amount of $766,889.54 and the correct pension benefit amount is $526,504.26. *The difference between these amounts is an overpayment plus interest of $257,903.91 and you're required to return this amount to the pension plan.*

(*Id.* (ellipsis and emphasis in FAC).)[5] The Notice did not provide any further explanation of the miscalculation. (*Id.*)

On or about December 14, 2011, Plaintiff filed a Claim Initiation Form with Kaiser Permanente Human Resource Service Center disputing the alleged overpayment of her pension benefit payout. (FAC ¶ 32.) On or about January 24, 2012, Plaintiff received a "Notice of Denial." The Notice stated:

> On February 26, 2006 you received a pay increase of *$8,367.83*. When the Kaiser Permanente Retirement Center calculated your pension benefit, a monthly pay rate of *$86,367.83* was used in lieu of the correct compensation for that pay increase. This resulted in an overstated Final Average Compensation . . . of $12,677.85. The correct [Final Average

---

[5] The amount that the Plan seeks to recoup from Plaintiff includes nearly $18,000 in interest.

6

> Compensation] that should have been used is *$8,657.58*. This resulted in your pension benefit being overstated.

(FAC ¶ 33 (emphases in FAC).)

Plaintiff timely appealed the Denial of Benefit Claim for overpayment of pension benefit. (FAC ¶ 34.) On or about June 11, 2012, Kaiser and/or the Plan denied Plaintiff's Appeal. (*Id.*) Plaintiff has exhausted all of the requisite administrative remedies. (*Id.*)

Pursuant to the Plan, Plaintiff is prohibited from seeking full time employment with Kaiser. (FAC ¶ 35.).

## III. APPLICABLE LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Johnson v. Lucent Techs., Inc.,* 653 F.3d 1000, 1010 (9th Cir. 2011). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

## IV. DISCUSSION

### A. EQUITABLE ESTOPPEL

Plaintiff's first claim is for equitable estoppel and is asserted against Kaiser and the Plan only. She brings this claim under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)(3)(B). Section 1132(a)(3) provides that a civil action may be brought:

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) *to obtain other appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3) (emphasis supplied). Plaintiff bases her equitable estoppel claim on subsection (B)'s authorization of "appropriate equitable relief." (FAC ¶ 37.) As set forth below,

Plaintiff's claim does not satisfy the Ninth Circuit's stringent test for pleading an equitable estoppel claim under federal law.

### 1. Applicable Equitable Estoppel Principles

ERISA preempts state-law equitable estoppel claims. *See* 29 U.S.C. § 1144(a); *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1095 (9th Cir. 1985) ("ERISA preempts common law theories of breach of contract implied in fact, promissory estoppel, estoppel by conduct, fraud and deceit, and breach of contract."). However, the Ninth Circuit, unlike some other circuits, "has recognized that federal equitable estoppel principles can, in certain circumstances, apply to some claims arising under ERISA." *Greany v. W. Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821 (9th Cir. 1992) (citing *Davidian v. S. California Meat Cutters Union & Food Employees Ben. Fund*, 859 F.2d 134, 136 (9th Cir. 1988); *Ellenburg*, 763 F.2d at 1096).

Though such claims are permissible, the range of circumstances under which they may succeed is narrow. ERISA plaintiffs generally may not prevail on an equitable estoppel theory unless they can plead and prove (1) material misrepresentation, (2) reasonable and detrimental reliance thereupon, and (3) "extraordinary circumstances." *Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996) (citing *In Re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation,* 58 F.3d 896, 907 (3rd Cir. 1995)). In addition, and unlike the law of other Circuits, the Ninth Circuit imposes "two additional prerequisites":

> First, the provisions of the plan at issue must be ambiguous such that reasonable persons could disagree as to their meaning or effect. . . . Second, representations must be made to the employee involving an oral interpretation of the plan. . . . Unless both conditions are met . . . a beneficiary has no equitable estoppel claim.

*Id.* (citing *Greany,* 973 F.2d at 821) (internal quotation marks omitted); *see also Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1527 (9th Cir. 1993) (same standard).

These additional prerequisites rest on the premise that "[a] plaintiff cannot avail himself of a federal ERISA estoppel claim based upon statements of a plan employee which would enlarge his rights against the plan beyond what he could recover under the unambiguous language of the plan itself." *Greany*, 973 F.2d at 822. The requirements of an ambiguous plan provision and an oral interpretation of the plan are intended to vindicate ERISA's requirement that plan terms be written

8

and amended only in a manner consistent with the statute: "where the equitable estoppel claim would result in a payment of benefits that would be inconsistent with the written plan and where an oral amendment or modification would be the practical result of a successful estoppel claim," the claim must be denied because "both outcomes would contradict the writing and amendment requirements of 29 U.S.C. §§ 1102(a)(1) and (b)(3)." *Id.*

### 2. Equitable Estoppel Analysis

Kaiser and the Plan argue that Plaintiff's claim fails because it would have the effect of expanding her rights beyond those provided by the Plan's unambiguous language. (Mot. at 6; Reply at 2-3.)  The Court agrees.  Plaintiff's claim, if successful, would have the effect of enlarging Plaintiff's rights against the Plan by estopping Kaiser and the Plan from attempting to recoup the nearly $250,000 overpayment they made to her after Hewitt allegedly miscalculated Plaintiff's benefit and then repeatedly reported its miscalculation as a correct and final determination of her benefit.  Plaintiff, in claiming that she is entitled to keep the overpayment, does not argue that it is *the terms of the Plan* which so entitle her.  Rather, she contends that it would be unjust to permit the Plan to recoup such a considerable sum from her given her blamelessness for the overpayment, the degree of care with which she planned her retirement, Defendants' considerable delay in discovering the overpayment, and the fact that Plaintiff, by the time Defendants apprised her of their mistakes, had long since commingled the funds with her personal finances and had even paid taxes on them.  (*See* Opp'n at 14; Pl. Supp. Brief at 2.)  That argument runs contrary to the law of the Ninth Circuit.

Plaintiff argues that she can satisfy the Ninth Circuit test for equitable estoppel, but she also urges the Court to apply the decisional law of other circuits due to the "unique circumstances" of this case. As to the first argument, the Court disagrees that the Ninth Circuit test has been met. While Plaintiff has adequately alleged a material representation, reasonable and detrimental reliance thereon, and "extraordinary circumstances," Plaintiff has not identified an ambiguous plan provision and, consequently, is unable to allege an "oral interpretation" of such a provision. *Pisciotta*, 91 F.3d at 1331; *Renfro v. Funky Door Long Term Disability Plan*, 686 F.3d 1044, 1054 (9th Cir. 2012).

Plaintiff's key contention on this point is that the plan term "present value" is ambiguous in both meaning and effect "when it interacts with the information provided to Plaintiff." (Opp'n at 9.) That argument fails for two reasons. First, Plaintiff tacitly acknowledges that the term "present value," standing alone, is unambiguous, for the argued ambiguity arises from the *interaction* of the plan term "present value" with other statements made outside the four corners of the plan documents. The relevant inquiry, however, is whether the plan language *itself* is ambiguous. *See Renfro*, 686 F.3d at 1053 (declining to find ambiguity in a particular plan term based on "interaction between" that plan and another plan).[6] The ambiguity argued by Plaintiff does not inhere in the plan itself; rather, any ambiguity derives from an error on the part of the person describing the effect of the plan terms, i.e., the amount of Plaintiff's retirement benefit under the plan. Ambiguity and error are not equivalent.

Second, the Court determines that, while the Plan documents do not expressly define the term "present value," they do provide a mechanism by which it may be calculated. (*See* Dkt. No. 27, Art. C, at 8-10.) That the formula provided is complicated does not necessarily render it ambiguous. Plaintiff's failure to address the particulars of the formula or articulate a competing,

---

[6] For this proposition, Plaintiff relies on *Spink v. Lockheed Corp.*, 125 F.3d 1257 (9th Cir. 1997), for the proposition that Plan terms may be rendered ambiguous through "interaction" with other information provided to an ERISA beneficiary. Plaintiff misreads *Spink*. In that case, the Ninth Circuit found an ambiguity sufficient to support an ERISA beneficiary's equitable estoppel claim after determining that two separate provisions of the plaintiff's plan conflicted with each other. One provision, Section 2.01, specified that an employee could not participate in the plan if he or she was over 60 years of age at the time of employment, but another, Section 4.06, provided that statements of credited service time would be deemed "correct and final" unless the employee objected by a certain time. *Id.* at 1262. The plaintiff had commenced employment after age 60, rendering him ineligible to participate in the plan under Section 2.01; nevertheless, he also had received from his plan a series of statements indicating he had "accrued credited service time during the course of his employment," statements which the plan treated as "correct and final" under Section 4.06. *See id.* Thus, the plain language of the plan terms operated to make the plaintiff, on the one hand, ineligible for participation but, on the other, to credit him as having participated. In light of this direct contradiction, the Ninth Circuit determined that the plan was ambiguous in meaning and effect. *Id. Spinks*, then, does not stand for the principle that otherwise unambiguous plan language may be rendered ambiguous through "interaction" with other statements. Rather, it simply points to a familiar type of ambiguity, that of self-contradiction. Here, however, Plaintiff has not established that it was a contradiction in the Plan's terms that resulted in the overpayment of benefits; rather, Plaintiff's theory is that the overpayment resulted from carelessness in applying the Plan's terms. Accordingly, *Spinks* does not control.

reasonable explanation of the Plan language itself renders the FAC without an adequately pled ambiguity. *See McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000) ("An ambiguity exists when the terms or words of a pension plan are subject to more than one reasonable interpretation.").

The Court turns now to Plaintiff's alternative argument, which invites the Court to follow the precedents of certain other circuits that do not impose the two additional Ninth Circuit prerequisites. (*See* Opp'n at 13-15 (urging application of Third Circuit and Sixth Circuit tests).) As compelling as Plaintiff's allegations are, the Court must decline the invitation. *See Zuniga v. United Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987) ("District courts are, of course, bound by the law of their own circuit[.]"); *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("If a court must decide an issue governed by a prior opinion that constitutes binding authority, the later court is bound to reach the same result, even if it considers the rule unwise or incorrect.  Binding authority must be followed unless and until overruled by a body competent to do so."); *cf. Ortega v. United States*, 861 F.2d 600, 603 n.4 (9th Cir. 1988) (voicing disagreement with outcome mandated by a controlling precedent, but acknowledging that the "precedent deprives us of discretion to do equity."). This Court, like all federal courts, is bound to follow the precedents of its Circuit, which, in this case, require the Court to dismiss Plaintiff's equitable estoppel claim.  Doing otherwise would have the forbidden effect of enlarging Plaintiff's rights against the Plan.  That the result in this case may upset Plaintiff's well-laid plans for retirement, causing her to seek new professional opportunities after retirement age—for the terms of the Plan allegedly prevent her from seeking to return to her previous job, if it were open (*see* FAC ¶ 35)—is not a fact this Court is permitted to weigh.  Indeed, a recent Ninth Circuit ERISA case seems to counsel the Court to disregard harshness of results. *See Renfro*, 686 F.3d at 1054 ("Ultimately, even though we acknowledge . . . that the result may seem harsh, we cannot ignore the plain language of the Plans in order to palliate the effects of considered language on the occasional hard case." (internal quotation marks omitted)).  Because the FAC establishes that Plaintiff's equitable estoppel claim, if sustained, would result in a de facto enlargement of her rights against the Plan, the Court must dismiss that claim as a matter of Ninth Circuit law.

The *Whitman* case exemplifies the correct application of Ninth Circuit authority to facts similar to this case. *Whitman v. Hawaiian Tug & Barge Corp./Young Bros., Ltd. Salaried Pension Plan*, 27 F. Supp. 2d 1225 (D. Haw. 1998). In *Whitman*, an ERISA beneficiary received an incorrect determination of benefits due to a keypunch error, retired in reliance thereon, and was asked to return the overpayment when the plan discovered its error six months later. He sued to estop the recoupment effort. *Id.* at 1227-28. At the outset of that litigation, the plaintiff there sought a temporary restraining order and preliminary injunction. *See id.* at 1228-29. The district court denied the request, finding that the plaintiff was unlikely to succeed on the merits. *Id.* at 1229. As the district court explained:

> [S]everal circuits, including the Ninth Circuit, have rejected estoppel claims that were practically identical to Plaintiff's. [Citations.] In each case, the plaintiff received an incorrect benefit estimate prior to retirement, retired soon thereafter, and began receiving the incorrect benefit. The plan administration subsequently discovered the error and corrected the benefit. All three errors were substantial in magnitude, and all three plaintiffs claimed that they had relied on the erroneous figures. Nonetheless, all three courts rejected the plaintiffs' claims, because the relief they sought was contrary to the terms of the plan. Each of those courts held, as does this court, that estoppel cannot be applied in the ERISA context to permit recovery that is contrary to the unambiguous terms of a plan. As the Ninth Circuit stated, "Otherwise, every communication about prospective benefits could create a unique plan for a single participant who is not differently situated from fellow employees for whom the plan is established. Such a result would run counter to ERISA's overriding interest in avoiding side agreements that deviate from a plan applicable to all employees."

*Id.* at 1229-30 (quoting *Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1523 (9th Cir. 1993)).

The reasoning of *Whitman* applies here as well. As set forth above, the Court concludes that Plaintiff's equitable estoppel claim fails under applicable Ninth Circuit precedents because it (1) would enlarge Plaintiff's rights against the Plan and (2) does not identify an ambiguity in the Plan. Accordingly, the Court **GRANTS** Defendants' motion to dismiss Claim 1 of the FAC.

While the Court is not convinced that allowing an opportunity to amend will yield a different result, the Court is cognizant of Plaintiff's request for such an opportunity. (Opp'n at 22.) Pursuant to the admonition of Federal Rule of Civil Procedure 15(a) that courts "should freely give leave when justice so requires," leave to amend is given with extreme liberality. *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 701 (9th Cir. 2011); *Petersen v. Boeing Co.*, 715 F.3d 276, 282 (9th

12

Cir. 2013). Without a showing of prejudice, or a "strong showing" of undue delay, bad faith, or futility of amendment, Rule 15(a) imposes a presumption in favor of granting leave to amend. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003); *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994). Where a defendant asserts futility of amendment as the reason to deny leave to amend, such denial is improper unless it is clear that no amendment could save the pleading. *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011); *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009); *see also Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 725-27 (9th Cir. 2000) (holding that district court abused its discretion in denying ERISA beneficiary leave to amend complaint to add previously unpleaded but cognizable theory of relief). Here, Defendants request dismissal with prejudice. They do not state the basis of their request, though the nature of their arguments suggests that the ground may be futility. Weighing these considerations, the Court dismisses Plaintiff's equitable estoppel claim without prejudice to further amendment consistent with counsel's Rule 11 obligations.

### B. NEGLIGENCE AND NEGLIGENT REPRESENTATION

Plaintiff asserts a negligence claim against Hewitt alone for negligently calculating her lump-sum benefit, as well as a negligent misrepresentation claim for telling her the result of its incorrect calculation. Hewitt contends that these common-law claims are barred by ERISA's sweeping preemptive effect and thus, as a matter of law, must be dismissed with prejudice. Plaintiff responds by citing a handful of cases which, she says, stand for the proposition that ERISA does not preempt state-law professional malpractice claims against "non-fiduciary actuaries," and asserts, without support, both that Hewitt is such an entity and that her negligence claims against Hewitt "amount[] to" a professional malpractice action. (Opp'n at 15.) As set forth below, neither side is entirely correct. The Court concludes that Plaintiff's negligence claims, as presently pled, are subject to dismissal, but that leave to amend is warranted.

#### 1. Applicable ERISA Preemption Principles

"There are two strands to ERISA's powerful preemptive force." *Cleghorn v. Blue Shield of California*, 408 F.3d 1222, 1225 (9th Cir. 2005). First, ERISA preempts state laws that "relate to" an ERISA plan. *Id.*; 29 U.S.C. § 1144(a). Though the limiting principle in this expansive language

can be difficult to identify, precedent teaches that the statute "is to be read practically, with an eye toward the action's actual relationship to the subject plan." *Providence Health Plan v. McDowell*, 385 F.3d 1168, 1172 (9th Cir. 2004) (citing *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655-56 (1995)); *see also Gen. Am. Life Ins. Co. v. Castonguay*, 984 F.2d 1518, 1521-22 (9th Cir. 1993) (explaining that ERISA "regulates certain *relationships*" and that ERISA presumptively preempts laws affecting those relationships but not other relationships "where a plan operates just like any other commercial entity" (emphasis in original)). Thus, a "state law claim is preempted by ERISA if it has a 'connection with' or a 'reference to' an ERISA-governed benefit plan." *Wise v. Verizon Commc'ns, Inc.*, 600 F.3d 1180, 1190 (9th Cir. 2010) (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985)). "Stated another way, where 'the existence of an ERISA plan is a critical factor in establishing liability' under a state cause of action, the state law claim is preempted." *Id.* (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139-40 (1990) (brackets omitted)). "ERISA's preemption provision functions 'even when the state action purports to authorize a remedy unavailable under the federal provision.'" *Id.* at 1190-91 (quoting *Ingersoll-Rand*, 498 U.S. at 144 (brackets omitted)).

The second strand of ERISA preemption bars state-law causes of action that fall within the scope of ERISA's "comprehensive scheme of civil remedies to enforce ERISA's provisions . . . even if those causes of action would not necessarily be preempted" by § 1144(a). *Cleghorn*, 408 F.3d at 1225. "[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). Said another way, ERISA preempts state-law claims that merely would supply "alternative enforcement mechanisms" for ERISA provisions. *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 982 (9th Cir. 2001). Accordingly, ERISA plaintiffs "cannot obtain relief by dressing up an ERISA benefits claim in the garb of a state law tort." *Id.* at 983. "The Ninth Circuit has applied a 'but for' standard to assess the relationship between the harm alleged and the ERISA-governed plan for purposes of determining whether a plaintiff is seeking such an alternate enforcement

14

mechanism." *Serpa v. SBC Telecommunications, Inc.*, 318 F. Supp. 2d 865, 871 (N.D. Cal. 2004) (citing *Dishman*, 269 F.3d at 983). "To avoid ERISA preemption, [a plaintiff's] claim must exist even without the defendants' failure to pay her benefit." *Id.* Thus, in *Dishman*, the Ninth Circuit found no preemption of a plaintiff's claim for invasion of privacy stemming from surveillance by a private investigator hired by a defendant ERISA plan to verify the plaintiff's disability claim. The *Dishman* court found that the alleged intrusions on plaintiff's privacy did not "depend on or derive from his claim for benefits in any meaningful way." 269 F.3d at 983. Thus, under *Dishman*, the mere fact that the conduct at issue allegedly occurs in the course of administering an ERISA plan does not necessarily result in preemption: where the state-law claim has only a "tenuous, remote, or peripheral connection" to the ERISA plan, it is not preempted. 269 F.3d at 984 (quoting *Travelers*, 514 U.S. at 661); *accord Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 191-92 (4th Cir. 2002) ("[T]he simple fact that a defendant is an ERISA plan administrator does not automatically insulate it from state law liability for alleged wrongdoing against a plan participant or beneficiary.")

**2.   Preemption Analysis**

Hewitt raises a preemption challenge to both Plaintiff's negligence and negligent misrepresentation claims. Because Plaintiff's negligence claims self-evidently "relate to" an ERISA plan in some sense, they are presumptively preempted. *Cf. Castonguay*, 984 F.2d at 1521 (presuming preemption by ERISA of state laws that regulate "relationships" regulated by ERISA "or the obligations flowing from these relationships"). Even taking Plaintiff's pleading in the light most favorable to her, she falls short of meeting her obligation to provide the grounds of her entitlement to relief, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and establishing that she has put forth a "cognizable legal theory" that could so entitle her, *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). As articulated in her Opposition, Plaintiff's theory appears to be that ERISA does not preempt her claims because certain cases have found that ERISA did not preempt certain professional malpractice claims brought against outside, non-fiduciary providers of services to an ERISA plan. Plaintiff reasons that Hewitt, in this case, served as such a provider—specifically, an "actuary"—and that Plaintiff's negligence claims against Hewitt "amount to" a professional negligence claim. (Opp'n at 15-21; FAC ¶ 52 (alleging that

Hewitt "served as a non-fiduciary actuary" to the Plan).)  Taking Plaintiff's allegation of Hewitt's status as an actuary as true for present purposes, though the description of the acts performed by Hewitt in the context of this case strain the normal understanding of an actuary as a risk-management professional, it still does not follow that Plaintiff's negligence claims are tantamount to professional malpractice claims or that the circumstances that caused other courts to decline to find preemption of the professional malpractice claims asserted there are present here.  On the contrary, as Defendant accurately notes, the cases upon which Plaintiff relies involved instances where an ERISA plan itself sued its third-party service provider on behalf of and for the benefit of the plan, as opposed to, here, where a beneficiary sues a plan's third-party service provider for failures related to its calculation of benefits.  Plaintiff fails to articulate a cognizable legal theory animating her claims.  For that reason, the Court finds that dismissal is warranted.[7]

        The next question, then, is whether the negligence claims must be dismissed with prejudice.  As the Court previously explained, leave to amend is granted with extreme liberality and will be granted in the absence of a showing of prejudice to a defendant or strong showing of futility, undue delay, or bad faith.  Here, Hewitt argues that Plaintiff's negligence claims must be dismissed with prejudice as preempted because (i) they are "premised on and would not exist without the plan," (ii) "would not exist without reference to the Plan's payment of benefits," and (iii) "amount to an assertion of negligence in the administration and disbursement of Plan benefits."  (Reply at 8; *see also* Mot. at 8-10, 11-12.)  These statements are accurate but not complete.  Hewitt fails to account for a key allegation: Plaintiff's negligence claims do not seek damages for the denial of benefits, but rather for lost wages suffered as a result of Plaintiff's having abandoned her gainful employment at Kaiser, allegedly in reliance on Hewitt's erroneous representation of the amount of her retirement benefit and the Plan's alleged prohibition on her returning to full-time work at Kaiser.  Paragraph

---

[7] The Court rejects Plaintiff's secondary argument that dismissal of her negligence claims is unwarranted solely because she would be left without a remedy. *See Geweke Ford v. St. Joseph's Omni Preferred Care Inc.*, 130 F.3d 1355, 1359 (9th Cir. 1997) (The relevant inquiry in preemption analysis "is not whether a remedy exists . . . but rather whether the claims 'relate to' an ERISA plan[.]"); *Bast v. Prudential Ins. Co. of Am.*, 150 F.3d 1003, 1010 (9th Cir. 1998) ("Although forcing [plaintiffs] to assert their claims only under ERISA may leave them without a viable remedy, this is an unfortunate consequence of the compromise Congress made in drafting ERISA.").

35 of the FAC alleges that the Plan prohibits Plaintiff "from seeking full time employment with [Kaiser]." Paragraph 55, set forth as part of Plaintiff's negligence count against Hewitt, identifies Plaintiff's damages as follows: "Plaintiff, due to the provisions of the [Plan] is unable to obtain full time employment with [Kaiser,] thereby sustaining further loss in income, all to Plaintiff's damage in a sum to be shown according to proof." Paragraphs 62 and 63 express substantially the same notion in the context of Plaintiff's negligent misrepresentation claim against Hewitt. In light of these allegations, Plaintiff's negligence claims do not appear to seek payment of ERISA benefits, as was the case in the authorities Hewitt cites. Rather, the damage Plaintiff pleads in support of her negligence claims is the damage of wage loss. The Court cannot say at this juncture that amendment of Plaintiff's negligence claims, which seek damages for lost wages, would be futile. *See Dishman*, 269 F.3d at 983-84.

## V.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Motion to Dismiss of Defendants Kaiser Foundation Health Plan, Inc., Kaiser Permanente Retirement Plan, and AON, f/k/a Hewitt Associates, and **DISMISSES** Plaintiff's First Amended Complaint in its entirety. However, if Plaintiff can amend the complaint consistent with Rule 11 and within the confines of Ninth Circuit authority, Plaintiff may file a motion seeking leave to file such amended complaint, attaching the proposed pleading and explaining how she has corrected the deficiencies identified herein. Such motion shall be filed no later than **Tuesday, April 22, 2014**. If Plaintiff does not file the motion by that date, this dismissal shall be with prejudice.

This Order terminates Docket No. 17.

**IT IS SO ORDERED**.

Date: March 24, 2014

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**